NORTH BERWICK CO. *versus* NEW ENGLAND F. & M. INS. CO.

A forfeiture of a policy of insurance is to be construed strictly; and its enforcement is not to be favored.

The act of receiving an additional premium for a variation of the risk after the existence of facts which would authorize a forfeiture had become known to the insurers, must, in the absence of fraud and concealment, be regarded as a waiver of the forfeiture.

From the answer to a question in an application, that the factory insured is " worked *usually*" certain specified hours in the day time "in the summer," and certain specified hours " in the winter—*short time now*," it may be inferred that it was expected at times the factory would be run nights.

Where an agent, by the power of attorney appointing him, was authorized to "make insurance by policies of" the defendant company, "to renew the same, and to indorse upon policies issued by him permission to the assured to *vary the risk*, according to the rules and instructions he shall from time to time receive from said company, and all policies, issued by said agent, shall be to all *intents* valid and binding upon said company;" and, upon the receipt of an additional premium, fixed by him, such agent varied the risk by a written permission to run the factory insured " day *and night*," until the expiration of the policy, without prejudice;" and the factory was burned in the night; — *Held*, that in the absence of any proof that the agent had violated any rules or regulations he may have received from the company, the permit to *run nights* was binding on the company, and the agent had ample power to waive such previous running which had come to his knowledge.

When the plaintiffs procured a policy on their merchandize in their store house, and another on their factory; and the former contained a provision that, " if the risk be increased by *any means whatever* within the *control* of the *assured*," it should be void, but no limitation as to the time the plaintiffs were to run their factory; but such limitation was contained in the latter; and, subsequently, such limitation was removed by the written permit of the defendants in consideration of an additional premium; — *Held*, that the policies were distinct and independent; and the removing of the limitation was not an " *increase of the risk*," within the meaning of the former policy.

It is no objection that only a *few*, and not *all*, of the letters comprising a correspondence between the parties, are offered in evidence.

ON EXCEPTIONS from *Nisi Prius*, DAVIS, J., presiding.

ASSUMPSIT on two policies of insurance against fire.

One policy (No. 48) was on the merchandize in the "store house." This policy contained a provision that, "if the risk

North Berwick Co. *v.* N. England F. & M. Ins. Co.

be increased by any means whatever, within the control of the assured," the policy shall be void.

The other policy (No. 110) was on a factory and other buildings (not including the "storehouse") and machinery, standing about eighty feet from the "storehouse."

The material facts sufficiently appear in the opinion of the Court.

*Rand*, for the defendants.

This is an action upon two policies of insurance, both issued and based upon "surveys and descriptions," which, (by condition 12 on policies,) are a part of the policy and warranty on the part of the insured.

Question 17, in survey, &c., upon which policy 110 issued, asked, "during what hours is the factory worked?" and the answer stated, "usually $6\frac{1}{2}$ A. M. to $12\frac{1}{4}$ P. M., and 1 to 7 P. M. in summer," &c.

This answer was a warranty, and, if not strictly kept, avoided the policy. The importance of this answer is obvious.

It is a common and familiar principle that, in insurance, warranties are regarded as conditions precedent, and no contract exists unless they are strictly and literally complied with.

In fact, as appears by Hobbs' testimony, the mill was run all night, from August 1, and was burnt in the night; that this was a gross breach of warranty, and avoided the policy from the moment they began to run all night, cannot be denied.

But the plaintiffs attempt to avoid this fatality to policy 110, by setting up a pretended waiver of this breach of warranty. But it will be found, upon a careful examination of the letters of the parties, and of the indorsement upon the policy, that there was no waiver of the breach, but only a permit to run by night from and after a certain date, (either Oct. 19, 24, or 26, date of letters, or Nov. 1st, date of indorsement on the policy.)

In the letter of Oct. 19, the plaintiffs say, they wish to run by night " from now" to the end of the policy. In that of Oct. 24, defendants say they will give such permit " for the unexpired time," " by paying one-fourth per cent. for three months." In that of Oct. 26, the plaintiffs state their own understanding of the permit " for three months."

The indorsement of Nov. 1st, upon the policy, is in accordance with the correspondence, and prospective only.

It will be perceived that nothing is said about their having run already from Aug. 1, to date of their first letter, (Oct. 19;) not a word about their having already broken their contract and avoided their policy, but a simple request for permission to run in future for a consideration.

The defendants had no knowledge of any breach and discharge, and could not waive that of which they knew nothing. If the plaintiffs would set up a waiver, they must show that they communicated all the facts to the defendants, and that the defendants acted understandingly with full knowledge of all the facts. This the plaintiffs did not do. Even an express waiver, made without a full knowledge of the facts, particularly where the facts are solely within the knowledge of the other party, is no waiver.

. But, if it be said that the defendants' agent, Slade, knew of the running, and he waived, it does not appear that he knew they had been running from August 1st. He may have known that they had been running from October 24, when permit was given by letter.

But the agent had no authority to waive a breach of the contract or a total avoidance of the policy. His authority is in writing; his powers are limited to those set forth in the writing, and that confers upon him no authority to waive breaches of warranty, or to revive policies. He testifies that he did not communicate in any way with the office. Indeed, there is no evidence of any direct waiver by him, and any inference that he did so, is only an inference that he did what he had no authority to do.

. As to policy 48, and the property covered by it. The

building containing the property insured, was 88 feet distant from the factory insured by policy 110. This property was destroyed at the same time, by fire communicated from the burning factory.

By the 2d paragraph of the 1st condition of insurance, it is declared that "if, after insurance is effected, the risk be increased by any means whatever within the control of the assured, such insurance shall be void and of no effect.

The running the mill, (insured by policy 110,) by night, in violation of policy 110, increased the risk under policy 48, and, if so, avoided the latter policy.

The jury should have been instructed that, if the running the factory (policy 110) by night, as testified, increased the risk under policy 48; such increase of risk by the assured, avoided the policy 48. At any rate, the instruction given to the jury upon this point was clearly erroneous. *Houghton* v. *Manuf. Ins. Co.*, 8 Met., 121–2; Angell on Fire Insurance, 196, § 162.

The *copies of letters* introduced by the plaintiffs, were inadmissible, because they were only part of the correspondence, and because notice to produce originals was insufficient. 1 Greenl. Ev., § 562, note.

*T. M. Hayes*, for the plaintiffs.

The opinion of the Court was drawn by

APPLETON, C. J. — This is an action upon two policies of insurance issued by the defendants.

The policy, No. 110, insures the plaintiffs' factory and other buildings and machinery, for the term of one year from Jan. 1, 1861.

The seventeenth interrogatory in the application and survey is, — "during what hours is the factory worked?" The answer is, — "usually from 6½ A. M. to 12¼ P. M. and 1 to 7 P. M. in summer; from 6¾ A. M. to 12¼ P. M. and 1 to 7 P. M. in winter. Short time now."

It appears that after Aug. 1, the mill was run all night, and that on Oct. 19th, the plaintiffs applied to John P.

Slade, the defendants' agent, for permission to run it all night from "now to the end of the policy;" that, on Oct. 24th, Slade writes that the insurance companies will give the defendants a permit to run their "mill nights for the unexpired time due" on their policies, "by paying ¼ per cent. premium, for three months." The plaintiffs, on 26th of October, acceded to these terms. Thereupon, Slade the agent of the defendants, indorsed on the plaintiffs' policy, the following memorandum : —

"Fall River, Nov. 1, 1861.

"In consideration of fourteen and $\frac{28}{100}$ dollars additional premium, paid by the insured, permission is granted that the within named property may be run night and day until the expiration of this policy, without prejudice to the same."

"John P. Slade, *Agent.*"

The buildings and property insured were burned on the morning of Nov. 2.

The defendants insist that the answer to the 17th interrogatory is a warranty on the part of the plaintiffs, that their factory is not to be run nights, and that having been broken by running from Aug. 1st to 19th of October, the policy thereby became void; and that thus they are absolved from all legal obligation.

The defendants were not harmed by the running of the mill all night between the first of August and the 24th of October, when their agent stated to the plaintiffs the extra premium he should require for such running. From the answer to the seventeenth interrogatory, it may fairly be inferred that it was expected that at times the mill would be run nights. Whether such running, unattended with loss, would render the plaintiffs' policy void, it is neither necessary to consider nor to determine.

A forfeiture is to be construed strictly. Its enforcement is not to be favored. It may be waived by the acts and conduct of the party whose right it is to exact it. The renewal of a policy, after the existence of facts which would authorize the insurer to insist upon a forfeiture would be

deemed a waiver. Thus the forfeiture, by reason of a misrepresentation or concealment, may be waived by the insurers; as by receiving a new premium on a fire policy, after the misrepresentation is known. 1 Phil. on Insurance, § 668; *Allen* v. *Vermont Mut. Fire Ins. Co.*, 12 Vermont, 366. So the act of receiving an additional premium for the variation of a risk, must, in the absence of fraud or concealment, be regarded as having the same effect. It would be a gross fraud to receive a premium for the continuance of a policy or the variation of a risk, with the intention of avoiding the insurance, if the risk provided for should occur, and of retaining the premium in case it should not.

The agent of the defendants testified he knew the plaintiffs had been running their mill nights, when he gave his permission of Nov. 1, 1861. In his letter to the defendants of Nov. 2, he writes, — "they had been working night and day for some time. They wrote to me a few days ago for a permit to work day and night, and agreed to keep a watchman." The extra premium for permission to run the mill nights was received by the defendants after the loss, and without objection. No complaint appears to have been made on their part of any concealment or misrepresentation on the part of the plaintiffs or of their agent.

Nor is this all. The defendants, by their power of attorney under seal, appointed John P. Slade of Fall River, their agent; "and, as such agent, he is authorized and empowered to receive proposals for insurance against loss or damage by fire, and *to make* insurances by policies of said New England Fire and Marine Insurance Company of Hartford; *to renew* the same, or to *vary the risk*, according to the rules and instructions he shall from time to time receive from the said company. And all policies of insurance against loss or damage by fire, *issued by* said agent, shall be to *all intents* valid and binding upon the said New England Fire and Marine Insurance Company of Hartford."

There is no proof that the agent has violated any rules or regulations he may have received from the defendants.

His authority is most ample. He may issue polices. He may renew them. He may vary the risk. His *acts* are "to all intents valid and binding" on the defendants. Notice to him must be deemed notice to the company. The insured had a right to rely on his acts. Indeed, it has been held that a general agent may waive under some circumstances, a condition in the policy that no insurance shall he considered as binding till actual payment. *Sheldon* v. *Atlantic F. & M. Ins. Co.*, 26 N. Y., 460. Much more would he be deemed to have such right, when powers as ample as in the present case are conferred.

In the policy on the personal property there is found no limitation as to the time the plaintiffs were to run their mill. The plaintiffs might, therefore, so far as regards this risk, run their mill the maximum of time. The two policies have no connection. Each must be construed by itself. The instructions in this .respect were correct. There was no increase of risk within the meaning of the policy — for the plaintiffs were under no restrictions by its terms as to the time they might run their mill.

The letters introduced were legally admissible. They were originals. The plaintiffs were under no obligations to offer more of the letters of the defendants' agent than they should deem conducive to their interest.

*Motion and exceptions overruled.*

CUTTING, DAVIS, WALTON and BARROWS, JJ., concurred.